# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF WEST VIRGINIA MARTINSBURG

**CHRISTOPHER TYLER LONG,**
**CHRISTOPHER EMMETT LONG,**
**and EDY LONG,**

    Plaintiffs,

**v.**            **CIVIL ACTION NO.: 3:13-CV-65**
               **(JUDGE GROH)**

**M&M TRANSPORTATION, LLC;**
**MILLER & SONS AUTO AND TRUCK**
**REPAIR, INC.; KEVIN E. MILLER;**
**KENNETH ANDREW MILLER, JR.;**
**and PEGGY MILLER;**

    Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' REVISED MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT, AND DENYING AS MOOT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court for consideration of the Plaintiffs' Motion for Partial Summary Judgment [ECF 130], the Motion for Summary Judgment [ECF 128] of Defendants M&M Transportation, LLC ("M&M"), Kevin E. Miller, Kenneth Andrew Miller ("Andy Miller"), Peggy Miller, and Miller & Sons Auto and Truck Repair, Inc. ("Miller & Sons"), and the Defendants' Revised Motion for Summary Judgment [ECF 147]. For the following reasons, the Court **GRANTS** the Defendants' Revised Motion for Summary Judgment, **DENIES** the Plaintiffs' Motion for Partial Summary Judgment, and **DENIES AS MOOT** the Defendants' Motion for Summary Judgment.

# I. Background[1]

M&M is a trucking business owned by Andy, Kevin, and Peggy Miller ("the Miller Defendants"). In addition to owning M&M, Andy Miller is an employee of Miller & Sons, another trucking business. Kenneth Albert Miller, Jr. owns Miller & Sons.

M&M hired Christopher Tyler Long ("Tyler Long") as a mechanic. Tyler Long had been dating Kevin Miller's daughter, Angela Miller, and lived with Angela Miller and Kevin Miller's parents. Andy Miller trained Tyler Long for this position. One of Tyler Long's duties at M&M was to mount truck tires. M&M did not provide its mechanics with a cage or other restraining device to use when mounting truck tires. When training Tyler Long, Andy Miller did not instruct him to use such a device.

On March 3, 2013, Michael Mongold called M&M to repair a tire on his truck and spoke to Andy Miller. Andy Miller dispatched Tyler Long to perform this job. The job required that Tyler Long mount a tire on a single-piece rim wheel. Tyler Long did not use a cage or other restraining device when doing so. When he was mounting the tire, the tire exploded and severely injured him.

Due to this incident, Tyler Long was hospitalized and underwent physical rehabilitation. His parents, Christopher Emmett Long ("Emmett Long") and Edy Long, cared for him during this time. The Plaintiffs allege that Emmett and Edy Long directed the Miller Defendants to not contact Tyler Long, but the Miller Defendants did anyway by telephone and social media, through a hospital employee, and by visiting the place of Tyler Long's physical rehabilitation. The Plaintiffs maintain that the Miller Defendants sought to

---

[1] This section notes when a fact is disputed.

dissuade Tyler Long from making any claims regarding the incident. On April 3, 2013, after these alleged events, the Plaintiffs' counsel sent the Miller Defendants a letter directing them to not contact Tyler Long.

Based on the foregoing events, Tyler Long, Emmett Long, and Edy Long initiated this case against M&M, Miller & Sons, and the Miller Defendants. Their complaint raised deliberate intent, negligence, and outrage claims and allegations concerning loss of consortium, *respondeat superior*, joint venture, civil conspiracy, and veil piercing.

On November 27, 2013, M&M and the Miller Defendants filed a motion for partial judgment on the pleadings. On January 7, 2014, Miller & Sons filed a motion for judgment on the pleadings, and the Plaintiffs moved for leave to file an amended complaint. The Plaintiffs sought to add a conversion claim concerning property of Tyler Long, to add the Miller Defendants to the deliberate intent claim, and to revise their *respondeat superior*, joint venture, civil conspiracy, and veil piercing allegations.

On April 30, 2014, the Court granted in part the motion for leave to file an amended complaint and denied the motions for judgment on the pleadings as moot. The Court held that amending the *respondeat superior* and veil piercing allegations was futile. As such, the Court denied the motion to amend those allegations and ordered the Plaintiffs to file an amended complaint consistent with the Court's Order by May 14, 2014.

Because April 30, 2014 was also the dispositive motions deadline, the Plaintiffs filed a Motion for Partial Summary Judgment and the Defendants filed a Motion for Summary Judgment. On May 14, 2014, the Plaintiffs filed their amended complaint. Their complaint raises the following claims and allegations: (1) deliberate intent under West Virginia Code § 23-4-2(d)(2)(ii) against M&M and the Miller Defendants; (2) negligence against all

Defendants except Peggy Miller; (3) outrage against the Miller Defendants; (4) conversion and civil theft against the Miller Defendants; (5) loss of consortium; (6) joint venture; and (7) civil conspiracy.

On June 20, 2014, the Court granted the parties leave to file revised motions for summary judgment. The Court found good cause to do so because, as the motions deadline passed before the Plaintiffs filed their amended complaint, the parties did not have an opportunity to move for summary judgment as to the conversion claim and deliberate intent claim against the Miller Defendants. The Defendants then filed a Revised Motion for Summary Judgment. The Plaintiffs did not file a revised motion.

## II. Standard of Review

A court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, a court determines "whether there is the need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.

The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). That is, once the movant has met its burden to show an absence of material fact, the non-moving party must come forward with affidavits

4

or other evidence demonstrating there is indeed a genuine issue for trial. Fed. R. Civ. P. 56; Celotex Corp., 477 U.S. at 323-25; Anderson, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249 (citations omitted). A court should deny summary judgment "if the evidence is such that conflicting inferences may be drawn therefrom, or if reasonable men might reach different conclusions." Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co., 381 F.3d 245 (4th Cir. 1967); see also id. at 253 (noting "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").

### III. Discussion

The Plaintiffs move for summary judgment on their deliberate intent claim against M&M and their negligence claim against M&M and Miller & Sons. The Defendants move for summary judgment on all claims.

### 1.     Deliberate Intent Claim

The Plaintiffs raise a deliberate intent claim under West Virginia Code § 23-4-2(d)(2)(ii) against M&M and the Miller Defendants. They have moved for summary judgment on this claim as to M&M while the Defendants move for summary judgment as to the entire claim.

West Virginia Code § 23-2-6 of the West Virginia Workers' Compensation Act is "the exclusive remedy as against an employer for workplace injuries or death and provides general immunity from suit for such injuries or death to qualifying employers." Young v. Apogee Coal Company, 753 S.E.2d 52, 55 (W. Va. 2013). There is no immunity under the Act, however, "if the employer or person against whom liability is asserted acted with

'deliberate intention.'" W. Va. Code § 23-4-2(d)(2).

Section 23-4-2(d)(2)(ii) sets forth one way of proving "deliberate intention." Syl. Pt. 3, Young, 753 S.E.2d at 54 (citation and quotation marks omitted). To succeed on a subpart (ii) claim, a plaintiff must establish five elements:

(A) That a specific unsafe working condition existed in the workplace which presented a high degree of risk and a strong probability of serious injury or death;

(B) That the employer, prior to the injury, had actual knowledge of the existence of the specific unsafe working condition and of the high degree of risk and the strong probability of serious injury or death presented by the specific unsafe working condition;

(C) That the specific unsafe working condition was a violation of a state or federal safety statute, rule or regulation, whether cited or not, or of a commonly accepted and well-known safety standard within the industry or business of the employer, as demonstrated by competent evidence of written standards or guidelines which reflect a consensus safety standard in the industry or business, which statute, rule, regulation or standard was specifically applicable to the particular work and working condition involved, as contrasted with a statute, rule, regulation or standard generally requiring safe workplaces, equipment or working conditions;

(D) That notwithstanding the existence of the facts set forth in subparagraphs (A) through (C), inclusive, of this paragraph, the employer nevertheless intentionally thereafter exposed an employee to the specific unsafe working condition; and

(E) That the employee exposed suffered serious compensable injury or compensable death as defined in section one, article four, chapter twenty-three whether a claim for benefits under this chapter is filed or not as a direct and proximate result of the specific unsafe working condition.

W. Va. Code § 23-4-2(d)(2)(ii). A court, however, must dismiss a subpart (ii) action "upon motion for summary judgment if it finds . . . that one or more of the facts required to be proved by the provisions of subparagraphs (A) through (E) . . . do not exist." Id. § 23-4-2(d)(2)(iii)(B). In this case, the parties only dispute only whether the Plaintiffs can establish

subparagraph (B).

Subparagraph (B) requires proof that the employer had actual knowledge of two things: the condition and that the condition posed a "high degree of risk and the strong probability of serious injury or death." Id. § 23-4-2(d)(2)(ii)(B). "This requirement is not satisfied merely by evidence that the employer reasonably should have known of the specific unsafe working condition and of the strong probability of serious injury or death presented by that condition. Instead, it must be shown that the employer actually possessed such knowledge." Syl. Pt. 3, Blevins v. Beckley Magnetite, Inc., 408 S.E.2d 385, 386-87 (W. Va. 1991). It "is a high threshold that cannot be successfully met by speculation or conjecture." Mumaw v. U.S. Silica Co., 511 S.E.2d 117, 123 (W. Va. 1998).

The actual knowledge analysis "requires an interpretation of the employer's state of mind, and must ordinarily be shown by circumstantial evidence, from which conflicting inferences may often reasonably be drawn." Syl. Pt. 2, Nutter v. Owens-Illinois, Inc., 550 S.E.2d 398, 399 (W. Va. 2001). "[E]vidence of prior similar incidents or complaints," though not mandatory, can help establish actual knowledge. Id. As such, courts considering this "requirement have focused on factors such as (1) whether any prior injuries had occurred because of the condition; (2) whether the employer previously had been cited by government officials for the violation; and (3) whether there had been any prior complaints that would have put the employer on notice of the high degree of risk and strong probability of serious injury or death created by the condition." Baisden v. Alpha & Omega Coal Co., LLC, Civil Action No. 2:11-079, 2012 WL 259949, at *9 (S.D.W. Va. Jan. 27, 2012) (citing Blevins, 408 S.E.2d at 391-93).

These types of evidence, however, are not required. See Syl. Pt. 2, Nutter, 550

7

S.E.2d at 399. Indeed, in Syllabus Point 4 of <u>McComas v. ACF Industries, LLC</u>, 750 S.E.2d 235, 236-37 (W. Va. 2013), the Supreme Court of Appeals of West Virginia held that safety statutes, rules, or regulations can prove actual knowledge in certain circumstances:

> When a safety statute, rule or regulation, or a commonly accepted and well-known safety standard within the industry or business, imposes a specifically identifiable duty to inspect upon the employer, and the inspection would have revealed the specific unsafe working condition, the employer may be found to have had actual knowledge of the specific unsafe working condition . . . .

In <u>McComas</u>, an arc blast from an electrical box severely burned an employee. <u>Id.</u> at 237-38. The box, installed in the 1950s or early 1960s, had never been inspected. <u>Id.</u> at 238. The evidence showed that wear and tear of insulation in the box caused the blast. <u>Id.</u> The parties' experts agreed that Standard 70B applied to the box. <u>Id.</u> at 244. Standard 70B required that "fused, switch boxes, while energized, were to be inspected for overheating every three to six months and, when not energized, were subject to cleaning, inspection and maintenance every three to six years." <u>Id.</u> Standard 70E further "provided that '[i]nsulation integrity shall be maintained to support the voltage impressed.'" <u>Id.</u> The employee's expert opined that, if the employer had conducted the required inspections and maintenance of the box, "it would have shown the dangerous condition of the box." <u>Id.</u> The trial court found that Standard 70B "imposed a specific identifiable duty on [the employer] to inspect the switch box . . . pursuant to electrical safety in the workplace," but granted summary judgment for the employer because it found Standard 70B inapplicable to the plaintiff's particular work and working conditions. <u>Id.</u> at 239, 244. Relying on the rule pronounced in Syllabus Point 4, the Supreme Court of Appeals reversed, agreeing with the trial court's articulation of the duty imposed by Standard 70B but holding the employer's

"conscious indifference to that duty in the circumstances herein may not serve to avoid the actual knowledge requirement." Id. at 244.

Here, the parties do not dispute the facts relevant to the actual knowledge analysis. Those facts are:

- The tire that exploded had a warning label stating: "When mounting tire, use safety cage . . . .";

- M&M never received an OSHA citation for not having a cage for use when mounting single-rim tires;

- A tire-related incident had not occurred at M&M before Tyler Long's injury;

- The Defendants had never experienced a tire exploding during the mounting process;

- The Defendants did not believe that a cage was required when mounting a single-rim tire;

- OSHA never conducted a safety hazard assessment at M&M; and

- The OSHA regulation that applies to servicing single piece rim wheels–29 C.F.R. § 1910.177–was in M&M's files but none of the Miller Defendants had read it before the incident.

Under these facts, the Plaintiffs raise two theories to establish actual knowledge. First, they argue that § 1910.177 imposed a duty on the Defendants to provide Tyler Long with a safety cage or restraining device to mount the tire such that their failure to do so charges them with actual knowledge under Syllabus Point 4 of McComas. Alternatively, the Plaintiffs argue that M&M's possession of § 1910.177 charges the Defendants with corporate knowledge of § 1910.177, thereby satisfying the actual knowledge element.

In response, the Defendants argue that the Plaintiffs cannot establish actual knowledge circumstantially because it is undisputed that M&M did not know there was a

need to provide a cage for mounting tires, there were no prior tire-related incidents at M&M, M&M never received a complaint about the absence of a cage for mounting tires, and M&M never received an OSHA citation for not providing employees with a cage. The Defendants further aver that <u>McComas</u> does not apply because § 1910.177 does not mandate the use of a cage for the mounting of the type of tire that exploded, a single-piece rim wheel. They also maintain that the corporate knowledge argument fails because West Virginia law does not support it.

Here, first, Syllabus Point 4 of <u>McComas</u> does not apply because § 1910.177 did not "impose a specifically identifiable duty" upon the Defendants to provide employees with a cage when mounting truck tires on single-piece rim wheels. Section 1910.177(d)(1) states that an "employer shall furnish a restraining device for inflating tires on multi-piece wheels." This provision mandates that M&M provide its employees with a restraining device for jobs involving multi-piece rim wheels. In contrast, § 1910.177(d)(2) provides that an "employer shall provide a restraining device or barrier for inflating tires on single piece wheels *unless the rim wheel will be bolted onto a vehicle during inflation*." (emphasis added). There is no requirement that M&M supply a restraining device or barrier for mounting tires on single-piece rim wheels as such measures are not needed if the rim wheel is bolted during inflation. Accordingly, the Plaintiffs cannot establish actual knowledge under <u>McComas</u> because § 1910.177 did not impose a duty on the Defendants to provide its employees with a restraining device or barrier when mounting tires on the type of rim wheel at issue in this case.

Second, the mere fact that M&M had § 1910.177 and other OSHA regulations in their records does not establish actual knowledge. The Plaintiffs cite <u>Helton v. AT&T, Inc.</u>

709 F.3d 343 (4th Cir. 2013) for the proposition that "corporate entities also have constructive knowledge of the contents of their records." Id. at 356. Helton, however, is inapplicable here because it is an ERISA case. In fact, the Plaintiffs have not cited a single case that has relied on a corporate knowledge theory to satisfy the actual knowledge requirement. Even so, doing so for the first time in this case would contravene West Virginia law. Blevins held that it is not enough that an employer "reasonably should have known" of the condition and its risks. Syl. Pt. 3, 408 S.E.2d at 386-87. Rather, the employer must have "actually possessed such knowledge." Id. Allowing possession of records alone to prove actual knowledge would effectively absolve the Plaintiffs of their obligation to meet this heightened knowledge requirement. Moreover, even if the corporate knowledge theory was cognizable, it would fail because § 1910.177 itself does not reveal that mounting tires on single-piece rim wheels without a restraining device or barrier is an unsafe working condition given that it does not require their use in all circumstances.

Having rejected both of the Plaintiffs' arguments for entering judgment in their favor on this claim, the Plaintiffs have not shown that there is a genuine dispute of material fact as to the actual knowledge element. It is undisputed neither M&M nor the Miller Defendants actually knew that mounting a truck tire on a single-piece rim wheel without a restraining device was an unsafe working condition. There also is no circumstantial evidence indicating that the Defendants had such knowledge. Indeed, there is no dispute that a tire-related accident had not happened at M&M before Tyler Long's injury, that no one had ever informed the Defendants that a restraining device should be used during mounting, and that OSHA had never cited M&M for not providing a restraining device for use when mounting tires. See Baisden, 2012 WL 259949, at *9. Accordingly, because

11

there is no genuine issue of material fact and the undisputed evidence shows that the Plaintiffs cannot establish subparagraph (B), the Court grants summary judgment for the Defendants as to the deliberate intent claim.

### 2. Joint Venture

The joint venture claim seeks to hold M&M, Miller & Sons, and the Miller Defendants liable for the acts and omissions of each other if one of them is liable for the deliberate intent or negligence claim. The Defendants argue that this claim fails because there is no evidence showing that they had an agreement to share profits of a trucking-related venture. The Plaintiffs contend that there is a genuine issue of material fact on that issue because M&M and Miller & Sons operate in the same building with M&M not paying rent for the space, that M&M and Miller & Sons share tools and trucks, and Miller & Sons' owner contributed money to M&M.

A joint venture is "an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge. It arises out of a contractual relationship between the parties. The contract may be oral or written, express or implied." Syl. pt. 5, Armor v. Lantz, 535 S.E.2d 737, 739 (W. Va. 2000) (citation and quotation marks omitted). Members of a joint venture are "jointly and severally liable for all obligations pertaining to the venture, and the actions of the joint venture bind the individual co-venturers." Id. at 743.

In Armor, the Supreme Court of Appeals of West Virginia noted that the following are "'distinguishing elements or features' essential to the creation of a joint venture":

> As between the parties, a contract, written or verbal, is essential to create the
> relation of joint adventurers. . . . To constitute a joint adventure the parties
> must combine their property, money, efforts, skill, or knowledge, in some

common undertaking of a special or particular nature, but the contributions of the respective parties need not be equal or of the same character. There must, however, be some contribution by each party of something promotive of the enterprise. . . . An agreement, express or implied, for the sharing of profits is generally considered essential to the creation of a joint adventure, and it has been held that, at common law, in order to constitute a joint adventure, there must be an agreement to share in both the profits and the losses. It has also been held, however, that the sharing of losses is not essential, or at least that there need not be a specific agreement to share the losses, and that, if the nature of the undertaking is such that no losses, other than those of time and labor in carrying out the enterprise, are likely to occur, an agreement to divide the profits may suffice to make it a joint adventure, even in the absence of a provision to share the losses.

Id. (quoting Pownall v. Cearfoss, 40 S.E.2d 886, 893-94 (W. Va. 1946)) (footnote omitted).

Here, the parties do not dispute the evidence material to the profit-sharing issue. Different individuals own M&M and Miller & Sons. Consistent with their separate ownership, M&M and Miller & Sons maintain separate bank accounts. Further, Miller & Sons' owner testified in his deposition that any profits of Miller & Sons have always gone back into the business but that he collected a salary from Miller & Sons' bank account for his personal use. He also stated that Miller & Sons never provided M&M with financial assistance, but he personally provided financial assistance to M&M from time to time. This evidence shows that Miller & Sons did not share profits with any other person or entity. At most, Miller & Sons' owner used his personal funds to help M&M occasionally. This does not reasonably indicate that the entities and Miller Defendants agreed to share profits because Miller & Sons' owner did so in his personal capacity. Moreover, although Miller & Sons and M&M share a garage, tools, and service trucks, this evidence at most shows overlap of resources between these entities. It does not overcome the undisputed evidence showing that Miller & Sons and M&M were separately owned entities and the lack of evidence showing an agreement to share profits. Accordingly, this claim fails as a matter

13

of law because the undisputed evidence cannot reasonably be construed as showing that the Defendants had an agreement to share profits, an essential feature of a joint venture. See id.  The Court therefore grants summary judgment for the Defendants on this claim.

### 3.      Negligence

The Plaintiffs assert a negligence claim against M&M, Miller & Sons, Kevin Miller, and Andy Miller.  They move for summary judgment on this claim as to M&M and Miller & Sons.  They argue that the West Virginia Workers' Compensation Act does not immunize M&M from negligence claims because M&M has produced no evidence showing it paid all workers' compensation premiums.  They further aver that Miller & Sons is liable for negligently training Tyler Long and not giving him proper equipment to repair the tire.

The Defendants move for summary judgment as to this entire claim.  First, they argue that the Act immunizes M&M.  Second, they aver that Miller & Sons owed no duty of care to Tyler Long because Miller & Sons was not his employer and he performed the repair at issue for M&M.  Third, they contend that the Act immunizes M&M's owners Kevin and Andy Miller from this claim.  The Court will address the liability of M&M, Miller & Sons, and Kevin and Andy Miller in turn.

### a.      M&M

The West Virginia Workers' Compensation Act immunizes an employer from a negligence claim when the employer paid into the workers' compensation fund of the Act or self-insured by making direct payments of workers' compensation. W. Va. Code § 23-2-6.  There is no dispute that M&M is an employer under the Act.  Thus, M&M generally is immune from the Plaintiffs' negligence claim.  M&M loses this immunity, however, "by

14

defaulting in payments required by the . . . Act or otherwise failing to be in compliance with the Act." Syl. Pt. 2, Bias v. E. Associated Coal Corp., 640 S.E.2d 540, 541 (W. Va. 2006).

Here, the Plaintiffs argue that M&M is liable for negligence because it did not make the required payments under its workers' compensation policy. M&M had a workers' compensation insurance policy that was effective when Tyler Long was injured. Defs.' Ex. J. M&M made a down payment on the policy on August 24, 2012. Installment payments were due on November 15, 2012, February 15, 2013, and May 16, 2013. There is no evidence showing that M&M defaulted on those payments. To the contrary, Edy Long testified at her deposition that M&M's insurer had not denied Tyler Long's claim for medical expenses and had paid him for missed work. Emmett Long confirmed at his deposition that Tyler Long received workers' compensation benefits. Accordingly, there is no evidence showing that M&M defaulted in payments required by the workers' compensation policy or any genuine dispute of material fact on that issue. The Court therefore grants summary judgment in M&M's favor on the negligence claim because it is immune from it.

### b. Miller & Sons

Miller & Sons contends that it is immune from this claim because it did not owe Tyler Long a duty of care. The Plaintiffs argue that Miller & Sons owed Tyler Long a duty on two grounds. First, they aver that Miller & Sons was Tyler Long's employer because it used M&M employees (including Tyler Long) to perform work for its benefit. Second, they contend that Miller & Sons owed Tyler Long a duty of care because the job for Mr. Mongold was for its benefit. As such, they contend that Miller & Sons is liable for negligence because it owed Tyler Long a duty of care as his employer and did not maintain workers' compensation insurance covering him as required by the Workers' Compensation Act.

15

The Plaintiffs must show that Miller & Sons owed Tyler Long a duty of care to establish a negligence claim. Yeager v. Morgan, 429 S.E.2d 61, 63-64 (W. Va. 1993). A duty of care can arise from an employment relationship as the Act applies when there is such a relationship. See Syl. Pt. 2, Davis v. Fire Creek Fuel Co., 109 S.E.2d 144, 146 (W. Va. 1959) ("A contract of employment for remuneration is necessary to constitute the relation of employer and employee under the Compensation Act." (citation and quotation marks omitted)). The Act defines an employee as "all persons in the service of employers and employed by them for the purpose of carrying on the industry, business, service or work in which they are engaged." W. Va. Code § 23-2-1a(a).

Here, first, there is no evidence of record connecting Miller & Sons to the Mongold job. Mr. Mongold testified at his deposition that he called M&M to repair his truck tire and spoke to Andy Miller. Andy Miller testified that he dispatched an M&M employee (Tyler Long) to perform this job, that Tyler Long used an M&M tire on Mr. Mongold's truck, that Tyler Long used an M&M service truck on the job, and that Miller & Sons did not bill Mr. Mongold for the job. The Plaintiffs have produced no evidence disputing these facts. At most, they have shown that Andy Miller owned M&M and worked as an employee of Miller & Sons. The fact that Andy Miller had a role in both entities alone does not reasonably show that Tyler Long performed the job for the benefit of Miller and Sons. Indeed, all of the other evidence demonstrates that Miller & Sons had no connection to the job. Accordingly, a duty of care cannot arise from the Mongold job because one could not reasonably find that Tyler Long performed the repair for Miller & Sons.

The Plaintiffs have also failed to produce sufficient evidence showing that Miller & Sons owed a duty of care Tyler Long as his employer. There is no dispute that M&M hired

Tyler Long. Although Andy Miller trained Tyler Long and had a role in both M&M and Miller & Sons, those facts alone do not reasonably lead to the conclusion that Miller & Sons employed Tyler Long. Indeed, the Plaintiffs do not point to any evidence that Tyler Long ever performed work for Miller & Sons. Moreover, the evidence shows that M&M and Miller & Sons are separate entities as Andy Miller testified at his deposition that a job would be billed to Miller & Sons if he responded to it while M&M would be billed if an M&M mechanic responded. Accordingly, because there is no genuine dispute of material fact and one could not reasonably construe the evidence as showing that Tyler Long was an employee of Miller & Sons, the Court finds, as a matter of law, that Miller & Sons did not owe Tyler Long a duty of care. The Court therefore grants summary judgment in Miller & Sons' favor on the negligence claim.

### c. Kevin and Andy Miller

An employer's immunity under the Workers' Compensation Act extends to its "officer, manager, agent, representative or employee" when that person acted "in furtherance of the employer's business and d[id] not inflict an injury with deliberate intention." W. Va. Code § 23-2-6a.

Here, the Plaintiffs do not dispute that Kevin Miller is immune as an agent of M&M. Rather, they take issue with the fact that Andy Miller trained Tyler Long and was involved in M&M and Miller & Sons. As previously discussed, however, Tyler Long was an M&M employee. There is no dispute that it would be within the scope of Andy Miller's employment with M&M to train Tyler Long. Accordingly, the Court grants summary judgment in Kevin and Andy Miller's favor on the negligence claim because they are immune from it.

17

### 4.    Outrage

The outrage claim alleges that, although Tyler Long's parents directed the Miller Defendants to not contact Tyler Long after the incident, the Miller Defendants attempted to contact him by telephone and social media, through a hospital employee, and by visiting the place of his physical rehabilitation to dissuade him from bringing suit.   These acts allegedly occurred before the Plaintiffs' counsel sent the Miller Defendants a letter on April 9, 2013 that directed them to cease contacting Tyler Long.

The Miller Defendants move for summary judgment on the outrage claim.  They argue that the Plaintiffs have not produced evidence supporting these allegations or otherwise shown that they engaged in extreme and outrageous conduct.

To succeed on their outrage claim, the Plaintiffs must establish:

(1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

Syl. Pt. 3, Travis v. Alcon Labs., Inc., 504 S.E.2d 419, 421 (W. Va. 1998).

"Whether conduct may reasonably be considered outrageous is a legal question .

. . ."  Syl. Pt. 4, id.  When assessing whether conduct is outrageous, West Virginia courts have relied on the definition of extreme and outrageous conduct set forth in comment (d) of the Restatement (Second) of Torts § 46(1):

d. Extreme and outrageous conduct. The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict

18

emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. *Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'*

*The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.*

Tanner v. Rite Aid of W. Va., Inc., 461 S.E.2d 149, 156-57 (W. Va. 1995). This demands "strict proof of unprecedented and extreme misconduct." Id. at 157.

Here, the undisputed evidence of record demonstrates that most of the Plaintiffs' allegations are unsubstantiated. In a phone call, Emmett Long told Andy Miller not to contact Tyler Long. There is no evidence that Andy Miller tried to do so after this call. At most, his wife, Stephanie Miller, asked a hospital employee who was her acquaintance to visit Tyler Long's hospital room to visit Emmett and Edy Long on behalf of her family. There is no evidence showing that any of the Miller Defendants were involved in Stephanie Miller taking this step. As for Peggy Miller, Emmett Long had no direct contact with her. In fact, there is no evidence that Peggy Miller ever tried to contact Tyler Long. As for Kevin Miller, Emmett Long also told him to refrain from visiting Tyler Long. His sole contact with Kevin Miller occurred when Kevin Miller called him the night of the incident. However, on one occasion before the Plaintiffs' counsel sent the cease and desist letter, Kevin Miller

visited the hospital where Tyler Long was undergoing rehabilitation and left when the hospital would not let him enter.  Kevin Miller testified at his deposition that he viewed Tyler Long as a son and described how he spent more time with Tyler Long than his own son.  This undisputed evidence undermines the allegation that the Miller Defendants sought to contact Tyler Long for the purpose of dissuading him from bringing suit.  In fact, the record is devoid of any evidence showing that was the case.  Further, the Plaintiffs' own testimony refutes the allegations that the Miller Defendants attempted to contact Tyler Long by telephone and social media.  Edy Long testified at her deposition that she did not know of any attempts of the Miller Defendants to contact Tyler Long by phone or through Facebook.  Emmett Long similarly testified that he did not personally know of any attempts to contact Tyler Long through Facebook.

Viewing all of this evidence, the Plaintiffs' outrage claim boils down to two events– Kevin Miller once went to the hospital to visit Tyler Long before the Plaintiffs' counsel sent the cease and desist letter and a hospital employee visited Tyler Long's hospital room at Stephanie Miller's request.  These actions cannot reasonably be called outrageous given Kevin Miller's undisputed care for Tyler Long and the lack of a connection between Stephanie Miller's action and the Miller Defendants.  The Miller Defendants' actions therefore do not rise to the level of misconduct, let alone "unprecedented and extreme misconduct."  See id.  Accordingly, the Court finds that the Miller Defendants' conduct was not "outrageous" and grants summary judgment in their favor.

### 5.    Conversion

The conversion claim alleges that Tyler Long was "living in a property rented to him or made available to him by the [Miller] Defendants" and, due to the incident, left "a number

of his personal possessions at the aforementioned residence." It further claims that the Plaintiffs' counsel demanded the return of Tyler Long's belongings, but the Miller Defendants refused to do so.

The Miller Defendants argue that this claim fails because it is undisputed that Tyler Long lived at the home of Angela Miller's grandparents, not a home that they provided him. The Plaintiffs maintain that the fact that the Miller Defendants' counsel returned several of Tyler Long's belongings upon their counsel's request creates a genuine issue of material fact as to whether the Miller Defendants are liable for conversion.

The Supreme Court of Appeals of West Virginia defined conversion as follows:

> Any distinct act of dominion wrongfully exerted over the property of another, and in denial of his rights, or inconsistent therewith, may be treated as a conversion and it is not necessary that the wrongdoer apply the property to his own use. And when such conversion is proved the plaintiff is entitled to recover irrespective of good or bad faith, care or negligence, knowledge or ignorance.

Syl. Pt. 17, Rodgers v. Rodgers, 399 S.E.2d 664, 668 (W. Va. 1990) (citation and quotation marks omitted). Thus, as a threshold matter, a plaintiff must show that the defendant exerted an act of dominion over the property at issue. See id. As such, there are three ways to prove conversion: "(1) by a tortious taking; (2) by any use or appropriation to the use of the defendant indicating a claim of right in opposition to the rights of the owner; or (3) by a refusal to give up the possession to the owner on demand." Tilhance Creek Investments, LLC v. BCBank, Inc., Civil Action No. 12-0290, 2013 WL 1286130, at *8 (W. Va. Mar. 29, 2013) (citations omitted).

Here, the Plaintiffs argue that the Miller Defendants are liable for conversion because they refused to return Tyler Long's possessions. See id. For this claim to

succeed, they must establish that the Miller Defendants exercised dominion over the property.  See Syl. Pt. 17, Rodgers, 399 S.E.2d at 668.  The Plaintiffs have introduced no evidence showing that is the case.  It is undisputed that Tyler Long was living in the home of Angela Miller's grandparents when the incident occurred.  It cannot reasonably be concluded that the Miller Defendants exercised dominion over possessions in a home that they did not own or otherwise have control over.  The basis of this claim–that the Miller Defendants rented or made the home available to Tyler Long–therefore is unsubstantiated. At most, the record reveals that the Miller Defendants' counsel facilitated the transfer of property to the Plaintiffs.  It does not reasonably follow, however, that the Miller Defendants wrongfully possessed the property during the transfer process.  Indeed, there is no evidence showing that any of the Miller Defendants had and kept one of Tyler Long's belongings following the demand for his property's return.  Accordingly, the Miller Defendants are entitled to judgment as matter of law on the conversion claim because there is no evidence showing that the Miller Defendants took a distinct wrongful act of dominion over any of Tyler Long's property.

### 6. Civil Conspiracy

The Defendants seek summary judgment on the civil conspiracy claim.  The Plaintiffs base this claim on their deliberate intent and outrage claims.

West Virginia recognizes a civil conspiracy cause of action. Dunn v. Rockwell, 689 S.E.2d 255, 268 (W. Va. 2009).  "A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means."  Syl. Pt. 8, id. at 259.  "[T]he wrongful acts done

by the defendants to the injury of the plaintiff" creates this cause of action, not the conspiracy. Id. Civil conspiracy therefore "is not a *per se*, stand-alone cause of action." Syl. Pt. 9, id. at 259. Rather, it is "a legal doctrine under which liability for a tort may be imposed on people who did not actually commit a tort themselves but who shared a common plan for its commission with the actual perpetrator(s)." Id.

Here, because the Court granted summary judgment as to the deliberate intent and outrage claims, there is no underlying tort to support the civil conspiracy claim. Accordingly, this claim fails as a matter of law.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS** the Defendants' Revised Motion for Summary Judgment, **DENIES** the Plaintiffs' Motion for Partial Summary Judgment, and **DENIES AS MOOT** the Defendants' Motion for Summary Judgment.

Accordingly, the Court **DISMISSES** this action **WITH PREJUDICE**. The Court further **ORDERS** that this case be **STRICKEN** from this Court's active docket.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record.

**DATED:** September 5, 2014

GINA M. GROH
UNITED STATES DISTRICT JUDGE